IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-50

No. 310A21

Filed 6 May 2022

IN THE MATTER OF:  B.R.W., B.G.W.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 278 N.C. App. 382 (2021), affirming, in part, and reversing, in part, a permanency planning order entered on 27 March 2020 by Judge Jeanie Houston in District Court, Yadkin County.  Heard in the Supreme Court on 22 March 2022.

*James N. Freeman, Jr., for petitioner-appellee Yadkin County Human Services Agency.*

*Paul W. Freeman, Jr., for appellee Guardian ad Litem.*

*J. Thomas Diepenbrock for respondent-appellant mother.*

ERVIN, Justice.

Respondent-mother Kimberly S. appeals from the decision of a divided panel of the Court of Appeals affirming, in part, and reversing, in part, a permanency planning order awarding legal guardianship of respondent-mother's two minor children, B.R.W. and B.G.W.[1] to Shonnie W., the children's paternal grandmother.

---

[1] B.R.W. and B.G.W. will be referred to throughout the remainder of this opinion, respectively, as "Brittany" and "Brianna," which are pseudonyms used to protect the children's identities and for ease of reading.

After careful consideration of respondent-mother's challenges to the Court of Appeals'

decision in light of the record and the applicable law, we affirm the Court of Appeals'

decision.

## I.    Factual Background

### A. Substantive Facts

On 1 May 2018, the Yadkin County Human Services Agency received a child protective services report alleging that Brittany and Brianna, ages four and seven, respectively, were neglected juveniles. At that time, Brittany and Brianna were living in a house with their father, Matthew W.; the paternal grandmother; and a paternal great-grandmother. According to the allegations contained in the report, the father "was intoxicated and busting plates and throwing glass in the home." After the paternal grandmother removed the children from the home and contacted law enforcement officers, the father was placed under arrest for drunk and disorderly conduct, resisting a public officer, and violating probation. The father was expected to be incarcerated for the next two years.

On 14 June 2018, HSA filed a petition alleging that Brittany and Brianna were neglected juveniles in that they "live[d] in an environment injurious to [their] welfare." On the same date, Judge William F. Brooks entered an order placing the children in the custody of the paternal grandmother and great-grandmother pending further proceedings. After a hearing held on 25 June 2018, Judge Brooks entered an

order on 19 July 2018 finding that respondent-mother was living in Alexander County with her husband, John S., who "has an extensive criminal history including drug-related convictions, assault on a female, larceny, and multiple DWIs" and struggles with alcohol abuse. Judge Brooks further found that, after separating from the father and leaving his home in 2015, respondent-mother had "occasionally visited" with Brittany and Brianna at the father's home and at family gatherings but that she had "not made decisions regarding the minor children's education or welfare, contributed financially to their support and maintenance, or otherwise filled the role of parent/caretaker of the minor children since she and [the father] separated." As a result, Judge Brooks sanctioned the children's continued placement with the paternal grandmother and paternal great-grandmother and authorized both respondent-mother and the father to visit with the children on the condition that they not currently be incarcerated. Judge Brooks also ordered HSA to coordinate with the Alexander County Department of Social Services to conduct a home study of respondent-mother's residence and authorized HSA to place the children in respondent-mother's home if the agency determined the home to be "a suitable and appropriate placement for the minor children."

¶ 4      On 13 July 2018, respondent-mother and the stepfather entered an Out of Home Family Services Agreement with HSA pursuant to which they were required to (1) "[c]omplete a psychological assessment and complete any recommendations

made by the assessor," (2) "[p]articipate in a substance abuse assessment and complete any recommendations made by the assessor," (3) "[s]ubmit to random drug screens," (4) "[c]omplete a parenting education program and present [HSA] with a certificate of completion," and (5) "[d]emonstrate stable employment." On 27 July 2018, HSA reported that respondent-mother and the stepfather still lived in Alexander County, had full-time employment, had been attending parenting classes, and had been visiting with the children and that respondent-mother had spoken with the children by phone as well. According to the guardian ad litem, the children "say they like seeing their [m]om" but also express that they "like living with their grandmothers."

¶ 5    After a hearing held on 2 August 2018, Judge Brooks entered an order on 31 August 2018 adjudicating Brittany and Brianna to be neglected juveniles. According to Judge Brooks, respondent-mother and the stepfather had visited with the children on multiple occasions since entering HSA custody, with "[t]hese visits hav[ing] gone well and [with] their interactions with the children hav[ing] been appropriate." Although Judge Brooks "[took] note of the fact that a significant period of time [had] elapsed since [respondent-mother] [had] been involved in the lives of the minor children on a regular basis," it nevertheless found that she appeared to have "some bond" with her daughters. After keeping the existing placement and visitation orders in effect, Judge Brooks authorized HSA to increase the frequency and duration of

respondent-mother's visits with Brittany and Brianna. Finally, Judge Brooks established a primary permanent plan for the children of reunification, with a secondary permanent plan of guardianship.

¶ 6 On 16 August 2018, respondent-mother informed the Alexander County Department of Social Services that her landlord was selling the mobile home in which she and the stepfather had been living, that they were being forced to move, and that she did not know how the required home study could be conducted. On 29 August 2018, the Alexander County Department of Social Services declined to approve the home that respondent-mother and the stepfather occupied in light of their lack of stable housing and the stepfather's extensive criminal history.

¶ 7 After a 90-day review hearing held on 25 October 2018, Judge Robert J. Crumpton entered an order on 6 December 2018 finding that respondent-mother had made significant progress in satisfying the requirements of her family services agreement in light of the fact that she had secured temporary housing in Wilkes County, maintained stable employment, had access to reliable transportation, visited with the children regularly, remained in contact with HSA, submitted to random drug screenings, and completed a psychological assessment. On the other hand, Judge Crumpton found that respondent-mother had failed to complete a substance abuse assessment or a parenting education program. In addition, Judge Crumpton found that the stepfather had also been visiting with the children regularly, had remained

in contact with HSA, and had submitted to random drug screenings; that he was unemployed "due to a back injury"; and that he had not completed either a substance abuse assessment or a parenting education program. After noting that respondent-mother and the stepfather "have consistently attended visitation with the minor children" and "appear to be bonded with the children," so that HSA had exercised its authority to increase the amount of visitation to which respondent-mother and the stepfather were entitled, Judge Crumpton retained the existing visitation arrangement while authorizing HSA to increase the frequency and duration of the visits between respondent-mother, the stepfather, and the children and to allow unsupervised visitation. Finally, Judge Crumpton determined that the primary permanent plan for the children should remain reunification, with the secondary permanent plan being one of guardianship.

¶ 8        On 14 May 2019, HSA submitted a revised court report noting that respondent-mother had been "working diligently on her" family services agreement, that she had participated in parenting classes, and that she had an "agree[ment] to increase the hours she works so that her income can increase in order to best meet the needs of her child[ren]." Similarly, HSA reported that the stepfather had "made substantial progress" in satisfying the requirements of his own family services agreement despite the fact that he did not have a regular income. HSA noted that respondent-mother and the stepfather had been participating in unsupervised visitation with the

children on Saturday afternoons, that they took the children to church on the last Sunday of each month, and that respondent-mother was in compliance with her obligation to make court-ordered child support payments, having even made payments against an existing arrearage. After acknowledging the progress that both parents had made in satisfying the requirements of their family service agreements, HSA observed that "[p]arenting classes need to be completed and the home is not yet ready to house the children." As a result, HSA recommended that Brittany and Brianna remain in their current placement with the paternal grandmother and paternal great-grandmother and that it be authorized, in the exercise of its discretion, to allow overnight visitation between the children, on the one hand, and respondent-mother and the stepfather, on the other.

¶ 9 On 3 May 2019, the guardian ad litem submitted a report indicating that, while she "would like to support and encourage [respondent-mother's] relationship with" Brittany and Brianna, she had "serious concerns" relating to the stepfather. More specifically, the guardian ad litem stated that she had witnessed the stepfather "become increasingly angry with [HSA] social workers" at a Child and Family Team meeting, held on 26 April 2019, before "storming out mad and ordering [respondent-mother] [to] come with him." In light of this experience, the guardian ad litem stated that she was "extremely concerned about the safety of the girls, as well as [respondent-mother,]" and expressed the opinion that the "primary" motivation

underlying the attempts that respondent-mother and the stepfather had been making to obtain custody of the children was gaining access to thousands of dollars in custody-related tax benefits. The guardian ad litem explained that, according to the paternal grandmother, respondent-mother had told the paternal grandmother upon leaving the children with her in 2015 that "she would take the girls if [the father] and [the paternal grandmother] didn't allow [respondent-mother] and stepfather to claim the girls for [a] tax refund even though [the girls] did not live with them," with such an arrangement having continued to exist for three years prior to the beginning of HSA's involvement with the children. As a result, the guardian ad litem recommended that the stepfather be required to obtain a domestic violence and anger-related assessment and that respondent-mother be required to obtain an assessment for possible effects of domestic violence.

¶ 10          After a hearing held on 16 May 2019, Judge David V. Byrd entered a permanency planning order on 16 July 2019 in which he found that the Wilkes County residence occupied by respondent-mother and the stepfather was "safe and appropriate for the minor children" and that respondent-mother and the stepfather were "active participant[s]" in parenting classes and had been "implementing the lessons [that they] [were] learning during [their] interactions with the minor children." Judge Byrd endorsed the children's continued placement with the paternal grandmother and paternal great-grandmother and retained the existing visitation

plan, subject to the understanding that HSA had the authority to authorize additional overnight visitation. In addition, Judge Byrd ordered respondent-mother and the stepfather to obtain domestic violence assessments and determined that the primary permanent plan for the children should remain one of reunification, with the secondary permanent plan for the children being one of guardianship.

¶ 11          On 13 July 2019, Brittany and Brianna began overnight visits with respondent-mother and the stepfather at their residence in Wilkes County. On 23 August 2019, the counselor who performed the anger and domestic violence assessments for respondent-mother and the stepfather reported that, "after a very extensive domestic violence evaluation of both individuals and an anger management assessment of the [stepfather] plus having interviewed the couple separately and together, there is no indication of any domestic violence or anger issues." On 29 August 2019, Judge Brooks entered an order continuing the case until 26 September 2019 for the purpose of "allow[ing] [respondent-mother] to have stable housing" subject to the understanding that there would be no further continuances.

¶ 12          On 12 September 2019, HSA submitted a report stating that respondent-mother had "completed all objectives" set out in her family services agreement and recommended the commencement of a trial home placement. On the other hand, a revised report submitted by the guardian ad litem on 17 September 2019 indicated that, despite the fact that respondent-mother was working and had access to reliable

transportation, the residence that she occupied with the stepfather was "not appropriate for full time care of the girls." According to the guardian ad litem, respondent-mother and the children slept in one bedroom, the stepfather's mother slept in the second bedroom, the stepfather slept in a recliner in the living room, and the stepfather's uncle slept on the couch. The guardian ad litem reported that, while respondent-mother and the stepfather had "said they are looking for a home for themselves and the girls," they had "made no progress in a year," and that, even though respondent-mother had stated that she "[didn't] want to take [Brittany] out of the Jonesville [Yadkin County] school district 'because she loves it so much,'" there was "no evidence" that respondent-mother and the stepfather had sought to obtain housing in Jonesville.

¶ 13        In addition, the guardian ad litem stated that (1), according to Brianna, the two children had ridden in the back of respondent-mother's pickup truck, an allegation that respondent-mother subsequently confirmed; (2), on 6 September 2019, a Friday, respondent-mother had been late in picking up Brianna from school and that, when Brianna complained of a headache and did not go to school on the following Monday, respondent-mother dropped Brianna off with the paternal grandmother instead of staying with Brianna, an action that caused the paternal grandmother to miss a day of work; (3), on the same date, Brittany's teacher reported that the child "would not sit down at her desk to work and also wouldn't talk," which was "unusual

behavior for her;" (4), on 13 September 2019, when the school lost power and could not reach respondent-mother to pick up the children, the paternal grandmother had been required to do so; and (5), on 18 September 2019, Brianna told the guardian ad litem that the stepfather had stated that, "from now on[,] he would be sleeping in the bed with [respondent-mother] rather than on the recliner and [that] [Brittany and Brianna] could sleep at the bottom of the bed[.]" In light of this information, the guardian ad litem concluded that respondent-mother was continuing a "lifelong pattern of pushing responsibility for the children off on the [paternal] grandmother," with "multiple sources" having informed the guardian ad litem that, "throughout these little girls' lives[,] [respondent-mother] has left them in [the] care of [the] paternal grandmother for long stretches of time, only visiting sporadically when convenient for her," while simultaneously "collect[ing] tax refunds of at least $7,000 each year for at least three years prior to [the upcoming permanency planning hearing] despite not providing primary care." According to the guardian ad litem, it was "very unlikely that either parent can be responsible for the girls without support from their own parents," with it being "in the best interest of the children that someone more dependable ha[ve] legal custody, while still allowing them to have a relationship with their parents." As a result, the guardian ad litem recommended awarding custody or guardianship to the paternal grandmother.

¶ 14    After a hearing held on 26 September 2019, Judge Brooks entered a consent permanency planning order on 6 November 2019 finding that, while respondent-mother had complied with most of the requirements of her family services agreement, the two-bedroom residence in which respondent-mother lived with the stepfather was "currently occupied by no less than four adults and lacks sufficient space for the minor children to return to on a permanent basis under these circumstances." Similarly, Judge Brooks found that the stepfather had complied with the requirements of his family services agreement with the exception of its housing-related provisions and his continued unemployment "due to a back injury," and that both respondent-mother and the stepfather had obtained domestic violence assessments. As a result, Judge Brooks concluded that, "in light of [respondent mother's] and [the stepfather's] near-completion of their [family services agreements], it is likely that the minor children can be returned home within the next six months." Judge Brooks continued the existing visitation arrangements and retained the existing primary and secondary permanent plans for the children.

¶ 15    On 21 November 2019, HSA filed a motion for review and requested a new permanency planning hearing for the purpose of "finalizing and obtaining permanency for" Brittany and Brianna in which it indicated that it would request that the paternal grandmother be made the children's guardian. On 17 December 2019, HSA submitted a report to the trial court in which it detailed the reasons that

it believed that the implementation of its revised proposed permanent plan would be appropriate. According to HSA, Brianna, who was then in third grade,

> has displayed some attachment and adjustment issues after weekend visitation with her mother. [Brianna] is having transition issues on Mondays at school once she had spent the weekend with [respondent-mother]. The school guidance counsel[lor], the princip[al] and [Brianna's] therapist Amber Dillard have reported issues with school transitions on Monday[s] and lasting all day. [Brianna] cr[ies] and ask[s] for her grandmother and is sad until time to be picked up. When [Brianna] is ask[ed] what is wrong she states that she misses her grandmother and wants to be with her. [Brianna] has stated to [HSA] at the last couple of home visits, and at a permanency planning meeting, that she want[s] to live with her grandmother and visit with her mother.

Similarly, HSA reported that Brittany "has displayed some attachment and adjustment issues after weekend visitation with her mother" and that, even though Brittany was seeing Ms. Dillard for therapy, she "does not talk a lot." As a result of "the continued statements and reports from other professionals, that [Brianna] has made in regards to [wanting] to remain in her grandmother['s] home[,] [HSA] request[ed] that Guardianship of both girls be granted to [the paternal grandmother] on this date and that the agency be released of any further efforts."

¶ 16 On 20 December 2019, the guardian ad litem submitted an additional report indicating that both Brittany and Brianna "are having very concerning emotional problems that seem to be tied to their weekend visits with their mother and stepfather," with Brianna's teacher reporting that Brianna "is often so distraught on

[Mondays] that she cannot focus on classwork and often breaks into tears" and with Brittany's teacher having noticed that, after these weekend visits, Brittany "would not sit down at her desk to work and also wouldn't talk," which was "unusual behavior for her." The guardian ad litem stated that, when she questioned Brianna about her behavior, Brianna said that "she likes seeing her mother but misses her grandmother." The guardian ad litem further reported that both girls expressed a desire to live with the paternal grandmother and great-grandmother, although they wanted to continue seeing respondent-mother and the father as well. However, Brianna told the guardian ad litem that respondent-mother "pays more attention to [the stepfather] than to us" and "sometimes doesn't even talk to [us]." As a result, the guardian ad litem concluded that it was not possible for the children to be returned to respondent-mother "within a reasonable period of time" given that

> [t]he children have been in [HSA] custody for over a year now and overnight visits only began in July with [respondent-mother]. After these visits, the girls exhibit extreme emotional distress. On at least two occasions—involving the girls riding in the back of the pickup truck, and involving the [stepfather] sleeping on the couch rather than the bedroom—[respondent-mother] was less than forthcoming about what was happening in her home and only discussed it after one of the children told [the guardian ad litem]. Because of this, [the guardian ad litem] has concerns about [respondent-mother] putting the girls' best interest above her husband's.
>
> . . . .

> In addition, the girls' primary care bond is to their grandmother, who has essentially raised them their entire lives. Even when their mother and father were married, they lived with their grandmother. When [respondent-mother] left 3-4 years ago, she only visited sporadically, and often only for an afternoon.
>
> It is in the best interest of the children that they remain in their current home, where they are most secure—their grandmother's.

As a result, the guardian ad litem recommended that the court award guardianship of the children to the paternal grandmother.

¶ 17    In anticipation of the new permanency planning hearing requested in its motion for review, HSA submitted a new report in which it expressed many of the same concerns outlined in the report submitted by the guardian ad litem. In recommending that the paternal grandmother be made the children's guardian, HSA noted that it

> recognizes that [respondent-mother] has completed all requirements of her [family services agreement]. However, while the children do have a bond with [respondent-mother], their bond and connection is primarily with their [paternal] grandmother. Both [Brittany] and [Brianna] primarily have always resided with their [paternal] grandmother who has provided the most stability and consistency regarding their care and supervision. [Respondent-mother] was absent from the children's lives for approximately three years (prior to the children coming into foster care) and during this time the children were cared for by their paternal grandmother.
>
> The children have continued to make statements to their social worker, [the guardian ad litem], and other

professionals that they wish to reside with their [paternal] grandmother but have visits with their parents. [HSA] is requesting that Guardianship of both girls be granted to [the paternal grandmother] on this date and that the agency be released of any further efforts.

On the other hand, HSA recommended respondent-mother continue to have weekend visits with the children.

On 30 January 2020, the trial court held a permanency planning review hearing. At that hearing, the paternal grandmother testified that she had been with Brittany and Brianna since they were born and described the children as "my life." The paternal grandmother testified that, after leaving the children with her in 2015, respondent-mother only visited the children on holidays and birthdays and failed to provide any child support despite the fact that respondent-mother and the paternal grandmother resided in the same county and the fact that respondent-mother had continued to claim the children as dependents for tax purposes until they entered HSA custody.

Respondent-mother testified that she and the stepfather had recently moved into a three-bedroom, two-bathroom house in Surry County and that she had full-time employment. Respondent-mother explained that she left the children with the paternal grandmother because the father, who had recently been released from prison, had resumed drug and alcohol use and because she had "been abused." Respondent-mother claimed that she had "seen the girls a lot more than what was

said" and that, on certain occasions when she was scheduled to visit with the children, the paternal grandmother would take the children and leave the house. Similarly, respondent-mother claimed that, in the years before she began making court-ordered child support payments, she had given the paternal grandmother between $2,000 and $3,000 in financial assistance and denied that she had claimed the children as dependents for tax purposes. Respondent-mother asserted that she had completed the requirements set out in her family services agreement and that she had been visiting with the girls on weekends for approximately five months. Respondent-mother testified that she had a "great" bond with her daughters, that they "have a really good time" together, and that both Brittany and Brianna were comfortable with both her and the stepfather. In conclusion, respondent-mother emphasized that she had "been there" for her daughters and that "[t]hey're my girls and I love them."

¶ 20    Steven Corn, a social worker employed by HSA, testified that one of the reasons that the agency had decided to change its recommendation relating to the children's primary permanent plan from reunification to guardianship was Brianna's statements to HSA staff and other professionals that, while "she has a bond with her mother," "she feels more secure with her grandmother and wants to live with her grandmother and continue just to have visitation with her mother." In addition, Mr. Corn stated that Ms. Dillard, who served as the children's therapist, had expressed concern that "on Monday mornings transitions [were] very hard" for the girls and

that, even though sometimes "Monday afternoons seemed to be better," on other occasions, "those transition episodes would last into maybe Tuesday also."

¶ 21     At the conclusion of the hearing, the trial court announced its intention to award guardianship of the children to the paternal grandmother and to allow respondent-mother to visit with the children every other weekend from Friday through Sunday in attempt to alleviate some of the transition-related problems that the girls were experiencing at school on Monday mornings. On 27 March 2020, the trial court entered a written permanency planning review order in which it found the following pertinent facts, among others, "by clear, cogent and convincing evidence:"

> 24. The Court finds requiring the children to live with [respondent-mother] and [the stepfather] is not in their best interest and is contrary to their health, safety and welfare. Therefore it is not possible for the children to be reunified to [respondent-mother's] home immediately or within the next six months.
>
> . . . .
>
> 30. At this time reunification efforts clearly would be unsuccessful and/or would be inconsistent with [Brittany] and [Brianna]'s health or safety and need for a safe, permanent home within a reasonable period of time.
>
> . . . .
>
> 34. The Court finds [respondent-mother] and [Father] by clear and convincing evidence are unfit to provide for [Brittany] and [Brianna]'s needs and have acted in a manner inconsistent with their constitutionally protected status as a parent. [Brittany] and [Brianna] have been in non-secure custody for 19 months. Respondent-mother] has completed her [family services agreement] but the

children have, since birth, resided in the home of [the paternal grandmother] and wish to remain there. [Respondent-mother] has not resided with the girls for now five years. [Father] is incarcerated again and has not completed a family services agreement.

As a result, the trial court concluded that placement of the children with either respondent-mother or the father would be "contrary to their health, safety, welfare and best interest" because the "[c]conditions that led to the custody of the children by [HSA] and removal from the home of the parent(s) continue(s) to exist." Finally, the trial court concluded that "the best interest of the minor children, [Brittany] and [Brianna], would be served by awarding guardianship to [the paternal grandmother]" while making it clear that either party had the right to file a motion for review at any time. Respondent-mother noted an appeal to the Court of Appeals from the trial court's order.

**B. Court of Appeals Decision**

In seeking relief from the trial court's order before the Court of Appeals, respondent-mother argued that the trial court had erred by awarding guardianship of the children to the paternal grandmother on the grounds that its determination that respondent mother was "unfit" and had "acted in a manner [inconsistent with] her constitutionally protected status as a parent" was "not supported by clear and convincing evidence, and [was] inconsistent with other findings of fact in the order." In addition, respondent-mother contended that the trial court had erred "when it

applied a best interest standard in making its guardianship decision" because that standard "is not applicable to an order granting custody or guardianship to a non-parent until after the court has properly found that the parent was unfit or has acted inconsistently with [her] constitutionally-protected rights." Finally, respondent-mother argued that the trial court's conclusion that placing the children in her home would be "contrary to their health, safety, welfare and best interest" was not supported by adequate findings of fact.

¶ 23    In evaluating the validity of respondent-mother's challenges to the trial court's order, the majority at the Court of Appeals began by observing that, in its findings of fact, the trial court had "treat[ed] unfitness and acting inconsistently with constitutionally protected rights as a single determination" despite the fact that they are "are two separate determinations" that "must be reviewed independently." *In re B.R.W. & B.G.W.*, 278 N.C. App. 382, 2021-NCCOA-343, ¶ 32 (citing *Peterson v. Rogers*, 337 N.C. 397, 403–404 (1994)). After acknowledging that "[p]rior cases have often not been clear on whether the determination of unfitness or acting inconsistently with a constitutionally protected right is a conclusion of law or a finding of fact," the Court of Appeals concluded that the issues of fitness and conduct inconsistent with one's parental rights were conclusions of law subject to de novo review. *Id.* ¶ 34 (citing *In re V.M.*, 273 N.C. App. 294, 298 (2020); *Raynor v. Odom*, 124 N.C. App. 724, 731 (1996); *Boseman v. Jarrell*, 364 N.C. 537, 549 (2010)).

¶ 24        In examining whether respondent-mother had acted inconsistently with her constitutionally protected status as the children's parent, the Court of Appeals noted that, "[e]ven where there is no question of a parent's fitness, a parent may act inconsistently with her parental rights by voluntarily ceding her parental rights to a third party," such as "where a parent voluntarily allows her children to reside with a nonparent and allows the nonparent to support the children and make decisions regarding the children's care and education[.]" *Id.* ¶ 42 (citing *Owenby v. Young*, 357 N.C. 142, 146 (2003); *In re Gibbons*, 247 N.C. 273, 280 (1957)). In making this determination, the majority at the Court of Appeals held that "[t]he trial court [had] properly considered [respondent-mother's] absence from the home and her lack of involvement with the children for three years prior to [the father's] arrest to support its conclusion that [respondent-mother] had acted inconsistently with her constitutionally protected rights." *Id.* ¶ 45. In the majority's view, "[respondent-mother] chose to forgo her constitutionally protected rights when she left her daughters in the care of [the paternal grandmother] for an indefinite period of time with no express or implied intention that the arrangement was temporary," *id.* ¶ 46 (citing *Boseman*, 364 N.C. at 552; *Price v. Howard*, 346 N.C. 68, 83 (1997)), and that the trial court's decision was "supported by the findings of fact, considering the totality of the circumstances," *id.* ¶ 46 (citing *Adams v. Tessener*, 354 N.C. 57, 66 (2001)).

¶ 25        In addressing the issue of whether respondent-mother was unfit to parent the children, the Court of Appeals observed that "[m]any of the findings of fact regarding [respondent-mother] addressed her compliance with most of the requirements of [her family services agreement]," including the fact that she had completed parenting classes; obtained assessments for domestic violence and anger management, neither of which resulted in recommendations for additional services; submitted to random drug screenings, all of which had been negative; engaged in unsupervised visitation with the children, including overnight and weekend visitation; and secured stable housing that was appropriate for children. *Id.* ¶ 48. As a result, the majority at the Court of Appeals held that "the trial court's findings of fact did not support a conclusion that [respondent-mother] is unfit" and reversed the trial court's order with respect to this issue. *Id.* Nevertheless, the Court of Appeals majority determined that, "because the trial court's determination that [respondent-mother] acted in a manner inconsistent with her constitutionally protected status was supported by the findings of fact, the trial court did not err in its grant of guardianship to [the paternal grandmother]." *Id.* (citing *Bennett v Hawks*, 170 N.C. App. 426, 429 (2005)). Accordingly, the majority held that the trial court did not err in determining that the "best interests of the child" supported an award of guardianship of the children to the paternal grandmother. *Id.* ¶ 49.

¶ 26        Finally, the Court of Appeals considered respondent-mother's contention that several of the trial court's conclusions of law were not supported by its findings of fact or else rested on a misapplication of the law. After noting that, to the extent that respondent-mother's arguments to this effect rested on a belief that the trial court had erred by concluding that she had acted inconsistently with her constitutionally protected status as the children's parent, any such argument would lack merit, the majority of the Court of Appeals held that the challenged conclusions of law had ample support in the trial court's findings of fact. *Id.* ¶ 50. In reaching this conclusion, the Court of Appeals noted that the fact that respondent-mother had made significant progress in satisfying the requirements of her family services agreement "does not automatically lead to a conclusion that the conditions which led to [the] removal [of Brittany and Brianna from her custody] do not continue to exist" and that, while it was true that, "by the time of the permanency planning hearing, [respondent-mother's] circumstances had changed in many ways," the trial court's conclusions were nevertheless supported by adequate findings of fact. *Id.* ¶¶ 52–53. In addition, the Court of Appeals rejected respondent-mother's contention that the trial court had erred by making an "abrupt" change to the permanent plan for the children despite the nature and extent of her success in satisfying the requirements of her family services agreement, reasoning that "[respondent-mother] cites no authority regarding the timing or 'abruptness' of a change in the plan to achieve

permanence" and, "as long as the trial court considers the factors as required by [N.C.G.S.] § 7B-901(c) and makes appropriate findings, we can find no abuse of discretion by the trial court's decision to change to guardianship." *Id.* ¶ 55.

¶ 27        Although Judge Carpenter expressed agreement with his colleagues' determination that the trial court's findings of fact had sufficient evidentiary support, he declined to join their determination that those findings supported certain of the trial court's conclusions of law. *Id.* ¶ 59 (Carpenter, J., concurring, in part, and dissenting, in part). More specifically, Judge Carpenter would have held that the trial court's findings of fact did not suffice to support the trial court's conclusions that "[p]lacement of the children, [Brittany] and [Brianna], to the mother or father's home at this time is contrary to their health safety, welfare, and best interests" and that the "[c]onditions that led to the custody of the children by [HSA] and removal from the home of the parent[s] continue(s) to exist." *Id.* Judge Carpenter noted that, even though the majority had relied upon respondent-mother's delay in obtaining suitable housing in support of its determination that respondent-mother had acted inconsistently with her constitutionally protected right to parent, the trial court had failed to make any findings of fact with respect to this issue and had, on the contrary, found that respondent-mother "has participated with the service plan and has made adequate progress within a reasonable period of time." *Id.* ¶ 62. In addition, Judge Carpenter pointed out that "adequate housing for the children was ultimately

obtained before the 30 January 2020 permanency planning hearing." *Id.* According to Judge Carpenter, "if [respondent-mother] had completed her family services agreement and was presumably in compliance with [that] agreement, including housing requirements, then the conditions that led to children's removal from their parents' home would surely have been eliminated in [respondent-mother's] home." *Id.* ¶ 65. As a result, Judge Carpenter would have held that the trial court's findings did not suffice to support its conclusion that respondent-mother had "act[ed] in a manner inconsistent with the health or safety of" her children, so that the trial court had erred by authorizing the cessation of efforts to reunify respondent-mother with the children. *Id.* (quoting N.C.G.S. § 7B-906.2(3)(4) (2019)).

¶ 28     In addition, Judge Carpenter disagreed with the majority's determination that respondent-mother had forfeited her constitutionally protected right to parent her children when she left Brittany and Brianna in the paternal grandmother's care for an extended and indefinite period of time. *Id.* ¶ 66. After acknowledging that "the record reveals that [respondent-mother] did indeed leave the father's home in 2015 while the minor children remained in the [paternal] grandmother's and father's care," Judge Carpenter pointed out that respondent-mother had "signed and completed [a family services agreement] on 13 July 2018, with which she made reasonable progress throughout the course of the plan;" that various trial judges had maintained reunification as the primary plan until the most recent hearing; and that the trial

court had "failed to make findings of fact that reunification would be inconsistent with the children's health and safety." *Id.* ¶¶ 68–70. In Judge Carpenter's view, a decision "[t]o ignore compliance with a case plan would serve to discourage parents who, like [respondent-mother], comply with [social services] requirements and recommendations and seek reunification with their children" and would be "detrimental to the success of the [HSA] program and similar programs." *Id.*at ¶ 70.

## II.  Substantive Legal Analysis

### A. Standard of Review

According to well-established North Carolina law, appellate review of a permanency planning order "is limited to whether there is competent evidence in the record to support the findings of fact and whether the findings support the conclusion of law," *In re L.M.T.*, 367 N.C. 165, 168 (2013) (cleaned up), with the trial court's findings of fact being "conclusive on appeal if supported by any competent evidence," *id.*; *see also Owenby*, 357 N.C. at 147 (noting that "the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary"). A trial court's determination that a parent has acted inconsistently with his or her constitutionally protected status as the parent is subject to de novo review, *Boseman*, 364 N.C. at 549, and "must be supported by clear and convincing evidence," *Adams*, 354 N.C. at 63.

### B. Acting in a Manner Inconsistent with Constitutionally Protected Status

¶ 30        The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects "a natural parent's paramount constitutional right to custody and control of his or her children" and ensures that "the government may take a child away from his or her natural parent only upon a showing that the parent is unfit to have custody" or "where the parent's conduct is inconsistent with his or her constitutionally protected status." *Adams*, 354 N.C. at 62 (citing *Troxel v. Granville*, 530 U.S. 57, 72–73 (2000)). In view of the fact that no party has challenged the validity of the Court of Appeals' determination that the trial court's factual findings had sufficient record support and that the trial court's findings did not support a determination that respondent-mother was an unfit parent before this Court, the principal issue that we must decide in this case is whether the trial court's findings of fact support its determination that respondent-mother had acted in a manner that was "inconsistent with [her] constitutionally protected status." *Id.*

¶ 31        In seeking to persuade us that this question should be answered in the negative, respondent-mother directs our attention to the trial court's factual findings concerning the nature and extent of her compliance with her family services agreement, in which the trial court stated that:

> 3.      [Respondent-mother] entered an Out of Home Family Services Agreement on July 13, 2018. The mother is employed . . . and has no known mental health or substance abuse issues. She resides with her husband, [the stepfather], who also entered a Family Services Agreement on July 13, 2018. [The stepfather] has applied for social

security disability benefits and is not employed at this time.

4. [Respondent-mother] and her husband have completed parenting classes and a Domestic Violence and Anger Management Assessment. The assessment had no recommendations for further services.

5. [Respondent-mother] has submitted to random drug screens; all have been negative for substances.

6. [Respondent-mother] and [the stepfather] have had unsupervised visitation including overnight and weekend visitation (every Friday – Monday morning). They have moved to a home that allows the children to have a bedroom.

7. [Respondent-mother] has participated with the service plan and has made adequate progress within a reasonable period of time. She has generally attended court hearings and has stayed in contact with [HSA] and the [Guardian ad Litem] Program.

In respondent-mother's view, "[t]here can be little doubt that these findings describing [her] compliance with her case plan do not support the conclusion that she acted in a manner inconsistent with her constitutionally protected status." Respondent-mother places considerable emphasis on the fact that the trial court had authorized her to have unsupervised overnight visitation with Brittany and Brianna given the fact that the entry of such an order must follow "a hearing at which the court finds the juvenile will receive proper care and supervision in a safe home," citing N.C.G.S. § 7B-903.1(c) (providing, in pertinent part, that, "[i]f a juvenile is removed from the home and placed in the custody or placement responsibility of a county

department of social services, the director shall not allow unsupervised visitation with or return physical custody of the juvenile to the parent, guardian, custodian, or caretaker without a hearing at which the court finds that the juvenile will receive proper care and supervision in a safe home").

After acknowledging the Court of Appeals' determination, in reliance upon *Boseman*, that "[her] actions related to leaving the home in 2015, allowing [the] paternal grandmother to care for her children and living separately from the children for three years constitutes actions inconsistent with her constitutionally-protected status," respondent-mother argues that "the facts of [*Boseman*] bear little resemblance to those [at issue] here." In *Boseman*, two women who had cohabited as domestic partners decided to have a child using a process pursuant to which the defendant became impregnated by means of artificial insemination and then allowed the plaintiff to adopt the child. *Boseman*, 364 N.C. at 539–40. After the couple separated and the plaintiff sought custody of the minor child, this Court concluded that, by bringing the plaintiff into the "family unit" and holding her out as the child's parent, the defendant had "acted inconsistently with her paramount parental status." *Id.* at 550–51. More specifically, this Court observed that

> [t]he record in the case *sub judice* indicates that defendant intentionally and voluntarily created a family unit in which plaintiff was intended to act—and acted—as a parent. The parties jointly decided to bring a child into their relationship, worked together to conceive a child, chose the child's first name together, and gave the child a

last name that "is a hyphenated name composed of both parties' last names." The parties also publicly held themselves out as the child's parents at a baptismal ceremony and to their respective families. The record also contains ample evidence that defendant allowed the plaintiff and the minor child to develop a parental relationship. . . . Moreover, the record indicates that defendant created no expectation that this family unit was only temporary.

*Id.* at 552.

¶ 33        Respondent-mother argues that in this case, unlike the defendant in *Boseman*, she "did not intentionally create a family unit including [the paternal grandmother], did not jointly name the children with [the paternal grandmother], and did not hold out [the paternal grandmother] to be a parent of the children." In addition, respondent-mother contends that, "after HSA became involved with her daughters, [she] fully pursued reunification, substantially completed her [family services agreement], and had been awarded unsupervised overnight visitation every weekend."

¶ 34        In a similar vein, respondent-mother attempts to distinguish this case from *Price* on factual grounds. In *Price*, after giving birth to a daughter, the defendant mother gave her daughter the plaintiff's last name on the child's birth certificate but did not name the plaintiff as the child's father on that document. *Price*, 346 N.C. at 70–71. In addition, "from the time of the child's birth, [the] defendant represented that [the] plaintiff was the child's natural father." At the time that the couple

separated and the defendant moved to Eden, the child remained in the primary

physical custody of the plaintiff and attended her first year of school in Durham,

where the plaintiff resided. *Id*. at 71. In a subsequent custody dispute during which

a blood test demonstrated that the plaintiff was not the child's biological father, the

trial judge determined that the best interests of the child would be served by

awarding primary custody of the child to the plaintiff even though both parties were

deemed "fit and proper persons to exercise the exclusive care and custody of the child."

*Id*. at 71. On appeal, this Court held that, while "[u]nfitness, neglect, and

abandonment clearly constitute conduct inconsistent with the protected status

parents may enjoy," "[o]ther types of conduct, which must be viewed on a case-by-case

basis, can also rise to this level so as to be inconsistent with the protected status of

parents." *Id*. at 79. In light of this fact, we concluded that

> [i]t is clear from the record that [the] defendant created the
> existing family unit that includes [the] plaintiff and the
> child, but not herself. Knowing that the child was her
> natural child, but not [the] plaintiff's she represented to the
> child and to others that [the] plaintiff was the child's
> natural father. She chose to rear the child in a family unit
> with the plaintiff being the child's de facto father. The
> testimony at trial shows that the parties disputed whether
> [the] defendant's voluntary relinquishment of custody to
> [the] plaintiff was intended to be temporary or indefinite
> and whether she informed [the] plaintiff and the child that
> the relinquishment of custody was temporary.

*Id*. at 83. As a result of the trial court's failure to make findings of fact addressing

the length of time over which the defendant intended to relinquish custody of the

child, we remanded this case to the trial court for a determination concerning whether the plaintiff and the defendant had reached any agreement about the length and scope of the custodial arrangement. *Id*. at 84.

¶ 35        According to respondent-mother, the facts at issue in *Price* "are completely distinct from those of this case" because "[t]his case does not involve a situation where [she] represented to the children and others that [the paternal grandmother], and not she, was the girls' parent." Instead, respondent-mother argues that she simply allowed the children to live with and be cared for by the paternal grandmother, continued to visit her children, and fully pursued reunification once HSA got involved. Respondent-mother concludes that, "[b]ecause the trial court's finding that [she] is unfit to provide for her daughter[s'] needs and has acted in a manner inconsistent with her constitutionally protected status as a parent is not supported by the findings of fact, the trial court erred when it applied a best interest standard" in determining that the paternal grandmother should be made the children's guardian.

¶ 36        In response, HSA argues that the Court of Appeals correctly determined that the trial court's conclusions of law were supported by its factual findings. More specifically, HSA points out that "one of the conditions that led to Brianna and Brittany's placement into [HSA] custody was [respondent-mother's] lack of contact and involvement in the [girls'] lives for three years prior to [HSA] involvement and

inappropriate housing." HSA contends that, even though respondent-mother "was never denied visitation or extended visits with the children" during the three years after she left the father's home, "she only exercised visitation on holidays and birthdays" and "provided no support to the paternal grandmother [while] continu[ing] to claim the children as dependents on her taxes," resulting in a situation in which the paternal grandmother "provided all financial support and made all parental decisions for Brittany and Brianna essentially from their birth forward." Arguing in reliance upon *Price*, HSA asserts that "a period of 'voluntary nonparent custody' may provide sufficient evidence of conduct inconsistent with the parent's constitutionally protected status, such that the best interest standard for custody determination is then employed." In addition, arguing in reliance upon *Speagle v. Seitz*, 354 N.C. 525 (2001), HSA claims that "a trial court should view a parent's conduct cumulatively, reviewing both past and present conduct by the parent and how it impacted the child," with there never having been "any agreement between [respondent-mother] and the paternal grandmother that the ceding of all custodial duties and responsibilities was temporary in nature."

¶ 37    According to HSA, "the only distinction in [respondent-mother's] actions and those of the complaining parent in *Boseman* and *Price* is that in those cases there was evidence *those parents* had provided primary parenting for the juveniles at some point in the past," while, in this case, "[b]oth Brianna and Brittany had lived with [the

paternal grandmother] since birth, and the trial court's unchallenged findings show [that] '[the paternal grandmother] has provided all care for the children for much of their lives and especially the past 19 months.'" As a result, in light of "the totality of the circumstances," HSA contends that "the trial court's findings of fact thus supported its conclusion that [respondent-mother] acted in a manner inconsistent with her constitutionally protected status as a parent."[2]

¶ 38 A careful review of the record satisfies us that the trial court's findings suffice to support its conclusion that respondent-mother had "acted in a manner inconsistent with [her] constitutionally protected status as a parent." As an initial matter, we recognize that, despite the fact that the trial court labeled this determination as a finding of fact, it is, in reality, a conclusion of law, *see Boseman*, 364 N.C. at 549 (describing the trial court's determination that the defendant "has acted inconsistent[ly] with her paramount parental rights and responsibilities" as a "conclusion" of law subject to de novo review); *Adams*, 354 N.C. at 65 (labeling the trial court's determination that the father's conduct "has been inconsistent with his protected interest in the minor child" a "legal conclusion"), to which "[w]e are obliged to apply the appropriate standard of review . . . regardless of the label which it is given by the trial court," *In re J.S.*, 374 N.C. 811, 818 (2020) (citing *State v. Burns*,

---

[2] The guardian ad litem has filed a brief urging us to affirm the Court of Appeals' decision advancing arguments that echo those advanced by HSA.

287 N.C. 102, 110 (1975)). For that reason, we will examine the trial court's remaining findings of fact for the purpose of determining if they support its conclusion that respondent-mother had acted inconsistently with her constitutionally protected right to parent the children.

¶ 39        As we have already discussed, "[u]nfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy," but "[o]ther types of conduct, *which must be viewed on a case-by-case basis*, can rise to this level so as to be inconsistent with the protected status of natural parents." *Price*, 346 N.C. at 79 (emphasis added). For that reason, "there is no bright line rule beyond which a parent's conduct meets this standard;" instead, we examine each case individually in light of all of the relevant facts and circumstances and the applicable legal precedent. *Boseman*, 364 N.C. at 549. *See also Estroff v. Chatterjee*, 190 N.C. App. 61, 64 (2008) (acknowledging that "[n]o litmus test or set of factors can determine whether this standard has been met."). In conducting the required analysis, "evidence of a parent's conduct should be viewed cumulatively." *Owenby*, 357 N.C. at 147 (citing *Speagle*, 354 N.C. at 534–35).

¶ 40        The majority at the Court of Appeals upheld the challenged trial court order on the grounds that respondent mother had "act[ed] inconsistently with her parental rights by ceding her parental rights to a third party." *B.R.W.*, ¶ 42. As we held in *Price*, "a period of voluntary nonparent custody[] may constitute conduct inconsistent

with the protected status of natural parents and therefore result in the application of the 'best interest of the child' test." *Price*, 346 N.C. at 79. In deciding *Price*, we placed substantial reliance upon *In re Gibbons*, in which we drew upon common law principles in holding that a parent's right to custody of his or her child may yield to the child's best interests in the event that the parent

> has voluntarily permitted the child to remain continuously in the custody of others in their home, and has taken little interest in it, thereby substituting such others in his own place, so that they stand in loco parentis to the child, and continuing this condition of affairs for so long a time that the love and affection of the child and the foster parents have become mutually engaged, to the extent that a severance of this relationship would tear the heart of the child, and mar his happiness.

247 N.C. 273, 280 (1957). In addition, we quoted, with approval, from a decision by the Supreme Court of Maine:

> "This petitioner for a period of more than four years showed not much more than a formal interest in his child. Circumstances were such that perhaps this was inevitable. He knew that the child was well cared for and was content to let the natural ties which bound him to his offspring grow very tenuous. Since the death of his wife there is little evidence that he has had any great yearning to have his child with him, to sacrifice for her, or to lavish on her the affection which would have meant so much to her in her tender years. Instead he surrendered this high privilege to the grandmother, who with the help of her unmarried daughters has given to this child the same devotion as it would have received from its own mother. Now having permitted all this to happen he claims the right, because he is the father, to sever the ties which bind this child to the respondent. In this instance the welfare of the child is

paramount. The dictates of humanity must prevail over
the whims and caprice of a parent."

*Id.* at 280–81 (quoting *Merchant v. Bussell*, 139 Me. 118, 124, 27 A.2d 816, 819

(1942)). Finally, we reiterated in *Owenby* that a parent's " 'failure to maintain

personal contact with the child or failure to resume custody when able' could amount

to conduct inconsistent with the protected parental interests[.]" *Owenby*, 357 N.C. at

146 (quoting *Price*, 346 N.C. at 84).

¶ 41        In *Price*, we directed trial courts, in evaluating cases involving nonparental

custodial arrangements, to consider "the degree of custodial, personal, and financial

contact [the parent] maintained with the child" after the parent left the child in the

nonparent's care. *Price*, 346 N.C. at 84. In addition, we emphasized the importance

of the issue of whether a nonparent custodial arrangement was intended to be

temporary or indefinite:

> This is an important factor to consider, for, if defendant
> had represented that plaintiff was the child's natural
> father and voluntarily had given him custody of the child
> for an indefinite period of time with no notice that such
> relinquishment of custody would be temporary, defendant
> would have not only created the family unit that plaintiff
> and the child have established, *but also induced them to*
> *allow that family unit to flourish in a relationship of love*
> *and duty with no expectations that it would be terminated.*

*Price*, 346 N.C. at 83 (emphasis added); *see also Boseman*, 364 N.C. at 552 (noting

that "the record indicates that defendant created no expectation that this [custody

arrangement] was only temporary."). Finally, in *Speagle*, we held that, when a trial

court resolves the issue of custody as between parents and nonparents, "any past circumstance or conduct which could impact either the present or the future of a child is relevant, notwithstanding the fact that such circumstance or conduct did not exist or was not being engaged in at the time of the custody proceeding." *Speagle*, 354 N.C. at 531.

¶ 42        In examining the facts of this case, we begin by reiterating that, even though respondent-mother challenged a number of the trial court's findings of fact as lacking in sufficient evidentiary support before the Court of Appeals, that court unanimously determined that this aspect of respondent-mother's argument to the trial court's order lacked merit, *see B.R.W.*, ¶ 56; *id.*, ¶ 59 (Carpenter, J., dissenting), and respondent-mother has not sought discretionary review of that aspect of the Court of Appeals' decision by this Court. As a result, the trial court's factual findings are deemed conclusive for the purposes of our evaluation of respondent-mother's challenge to the validity of the trial court's determination that she had acted inconsistently with her constitutionally protected right to parent Brittany and Brianna. *See In re T.N.H.*, 372 N.C. 403, 407 (2019) (noting that "[f]indings of fact not challenged by [the] respondent are deemed supported by competent evidence and are binding on appeal").

¶ 43        According to the trial court's findings of fact, respondent-mother left the father's home in 2015. At that time, respondent-mother surrendered custody of the

children to the paternal grandmother and made no attempt to reunify with the children until after they had been taken into HSA custody. In the course of that three-year period, respondent-mother visited the children on holidays and birthdays without ever having taken the children to her home overnight or visiting with them on other than special occasions. Although respondent-mother has taken a more active role in the children's lives in recent years, including paying child support and engaging in overnight and weekend visitation, she was unable to obtain suitable housing for the children until approximately one month prior to the relevant permanency planning review hearing, at which point the children had been in HSA custody for over 19 months. In addition, the trial court found that, "although [respondent-mother] and [the stepfather] have completed their family service agreement and have a bond with the children, the strongest bond is with [the paternal grandmother]"; that both girls had experienced "adjustment issues" following weekend visitations with respondent-mother and the stepfather; and that the children want to live in the paternal grandmother's home. In light of our cumulative view of respondent-mother's conduct, *Owenby*, 357 N.C. at 147, as described in the trial court's findings of fact, we hold that the relevant findings support the trial court's conclusion that respondent-mother acted in a manner inconsistent with her constitutionally protected rights as a parent by voluntarily ceding the custody and care of her children to the parental grandmother for a period of three years.

¶ 44      In contradistinction to the situation at issue in *Price*, the trial court's findings of fact in this case reflect that respondent-mother had a minimal "degree of custodial, personal, and financial contact" with her children following their placement in the paternal grandmother's custody. *Price*, 346 N.C. at 84. The minimal degree of contact that respondent-mother had with the children prior to their placement in HSA custody indicates that respondent-mother intended for the paternal grandmother to continue to provide primary care for the children for "an indefinite period of time with no notice that such relinquishment of custody would be temporary," *id*, 346 N.C. at 83, particularly given respondent-mother's failure to take any steps to regain custody of Brittany and Brianna until after they entered HSA custody, *see id*. (noting that, "to preserve the constitutional protection of parental interests in such a situation, the parent should notify the custodian upon relinquishment of custody that the relinquishment is temporary, and the parent should avoid conduct inconsistent with the protected parental interests"). As a result, the trial court's findings of fact show that respondent-mother "induced [the children and the paternal grandmother] to allow that family unit to flourish in a relationship of love and duty with no expectations that it would be terminated." *Id*.

¶ 45      The facts at issue in this case bear a strong resemblance to those that were before us in *Gibbons*, in which the child's adoptive father placed the child in the home of a nonparent married couple after the death of the father's wife at a time when the

child was just two years old. *Gibbons*, 247 N.C. at 275. The child remained in the couple's home for the next five years with the exception of "short visits with the [father]," with the father having made occasional small financial contributions for the child's support, paid some medical bills, and given the child a few small presents. *Id.* During the time, the child "became greatly attached to the [custodial couple], considering them as his father and mother," and resisted being returned to his father's home. *Id.* at 279. After the father petitioned to regain custody of the child, the trial court found that both the custodial couple and the father, who had since remarried, were "fit and proper persons to have custody of the [child]" and that, since the father had legally adopted the child, it was in the child's best interest to be returned to his father. *Id.* at 276–77. In reversing the trial court's order, this Court emphasized that the father had voluntarily left the child in the couple's custody for five years and had shown little interest in him during that time, so that "the love and affection of the child and the foster parents have become mutually engaged," *id.* at 280, before holding that the trial court had failed to give sufficient consideration to the child's wishes and remanding the case to the trial court for further proceedings, *id.* at 282–83.

¶ 46     In this case, respondent-mother left the children with the paternal grandmother when they were one and four years old, respectively, and only paid them occasional visits over the course of the next few years. In other words, like the father

in *Gibbons*, respondent-mother left responsibility for the children's care and wellbeing in the hands of the paternal grandmother, "where the sweet tendrils of childhood [had] first clung to all [they] [knew] of home," and where Brittany and Brianna developed a strong bond with the paternal grandmother, so that removing the children from the paternal grandmother's custody "would tear the heart of the child[ren], and mar [their] happiness." *Id.* at 280.[3]  Although we acknowledge that *Gibbons* was decided well before the enactment of the current North Carolina Juvenile Code and our decisions in cases like *Adams* and *Troxel*, its reasoning is consistent with the logic that we adopted in *Price* and reinforces our conclusion that the trial court did not err by holding that respondent-mother had acted inconsistently with her constitutionally protected parental right to parent Brittany and Brianna.

¶ 47        In respondent-mother's view, the trial court's determination that she had acted inconsistently with her constitutionally protected right to parent her children cannot be squared with the trial court's determination that respondent-mother substantially complied with the provisions of her family services agreement.  To be sure, respondent-mother's efforts to regain custody of her children following their placement into HSA custody are relevant to the issue of parental fitness, as the Court

---

[3] Although the record contains conflicting evidence concerning the nature and extent of respondent-mother's involvement in the children's lives in the years after she placed them in the care of the paternal grandmother, the trial court resolved that factual dispute against respondent-mother's position.

of Appeals recognized when it overturned the trial court's determination that respondent-mother was unfit. *B.R.W.*, ¶ 48.[4] As we held in *Price*, however, a lack of fitness is only one of the means by which a parent may act inconsistently with her constitutionally protected status as a parent, with a determination that the parent is not unfit being insufficient to compel a conclusion that the parent had not acted inconsistently with his or her constitutional right to parent his or her child in other ways. *Price*, 346 N.C. at 79; *see also David N. v. Jason N.*, 359 N.C. 303, 307 (2005) (holding that "the trial court's finding of [the father's] fitness in the instant case did not preclude it from granting joint or paramount custody to [the child's grandparents], based upon its finding that [the father's] conduct was inconsistent with his constitutionally protected status."); *Gibbons*, 247 N.C. at 276 (concluding that, even though the father was a "fit and proper person" to have custody of his son, he was not necessarily entitled to custody given that he had left his son in the custody of a non-parent for five years).

¶ 48    In addition, as we have recently observed, "a parent's compliance with his or her case plan does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 185 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020)). On the basis of similar

---

[4] As was the case with its determination that respondent-mother had acted inconsistently with her constitutionally protected status as a parent, the trial court labeled its determination that respondent-mother was "unfit" as a finding of fact. However, for the reasons discussed above, unfitness is more properly understood as a question of law, so we treat it as such. *See Raynor v. Odom*, 124 N.C. App. 724, 731 (1996).

logic, we hold that the fact that respondent-mother complied with the provisions of her family services agreement does not overcome the effect of her prior decision to surrender custody of her children to the paternal grandmother, particularly given the trial court's findings that the children's paramount bond was with the paternal grandmother rather than with respondent-mother and the difficulties that the children have experienced in being away from their grandmother. *See Speagle*, 354 N.C. at 531 (concluding that "any past circumstance or conduct which could impact either the present or future of the child is relevant[.]"). Although nothing in our opinion in this case should be understood to preclude any possibility that a parent who has taken affirmative steps, including compliance with the directives of a district court or social services agency, would be able to overcome the effects of past behavior that would be otherwise inconsistent with his or her constitutionally protected right to parent his or her child, we see nothing in the trial court's findings, in light of its analysis of the best interests of the children, that would prevent it from making the paternal grandmother the children's guardian in this case, notwithstanding respondent-mother's compliance with the provisions of her family services agreement.

¶ 49        In addition, we are not persuaded by respondent-mother's attempts to distinguish *Price* and *Boseman* from this case on essentially factual grounds. Simply put, nothing in either *Price* or *Boseman* suggests that the general principles

enunciated in those decisions should be limited to the factual context in which those cases were decided. On the contrary, as a long line of precedent from both this Court and the Court of Appeals makes clear, a parent may, in fact, act inconsistently with his or her constitutional right to parent his or her child in the event that he or she voluntarily cedes custody of a child to a nonparent party for an indefinite period of time. *See, e.g., David N.*, 359 N.C. at 305–07; *Owenby*, 357 N.C. at 146; *Gibbons*, 247 N.C. at 280; *Estroff*, 190 N.C. App. at 73–75; *Mason v. Dwinnell*, 190 N.C. App. 209, 224–26 (2008). Even if respondent-mother never represented that the paternal grandmother had obtained parental status,[5] the absence of such a determination should not obscure the fact that respondent-mother "voluntarily permitted the child[ren] to remain continuously in the custody of [the paternal grandmother],"

---

[5] In view of our recognition in *Price* that the defendant had "represented to the child and to others that [the] plaintiff was the child's natural father," 346 N.C. at 83, respondent-mother argues that "it was clear to all involved that [the paternal grandmother] was the paternal grandmother of the children, not their parent." *Price* did not, however, hinge upon the extent to which the defendant specifically represented that the plaintiff was the child's parent. Instead, our decision in that case rested upon the defendant's "voluntary relinquishment of custody to [the] plaintiff," who had assumed the status of "the child's *de facto* father." *Id.* In addition to the *biological* relationship between the children and the paternal grandmother in this case, the trial court's findings clearly show that the paternal grandmother stood *in loco parentis* to Brittany and Brianna. *See Gibson v. Lopez*, 273 N.C. App. 514, 519 (2020) (defining "*in loco parentis*" as "one who has assumed the status of a parent without formal adoption.") (citations and quotation marks omitted); *Black's Law Dictionary* (11th ed. 2019) (defining "person in loco parentis" as "[s]omeone who acts in the place of a parent" or "a person who has assumed the obligations of a parent without formally adopting the child."). This fact, combined with respondent-mother's voluntary relinquishment of custody to the paternal grandmother for three years, makes *Price* the appropriate analytical framework through which to view this case. *See Price*, 346 N.C. at 83; *see also Gibbons*, 247 N.C. at 280.

IN RE: B.R.W. & B.G.W.

2022-NCSC-50

*Opinion of the Court*

"continu[ed] this condition of affairs for so long a time that the love and affection of the child[ren] and [the paternal grandmother] [had] become mutually engaged," *Gibbons*, 247 N.C. at 280, and "created the existing family unit that includes [the paternal grandmother] and the child[ren], but not herself," *Price*, 346 N.C. at 83. As a result, we hold that the trial court made sufficient factual findings to support its conclusion that respondent-mother had acted in a manner inconsistent with her constitutionally protected status as the children's parent, so that the Court of Appeals did not err by upholding the trial court's decision with respect to this issue.

## C. Best Interest of the Child

¶ 50   In her second challenge to the Court of Appeals' decision to uphold the challenged trial court order, respondent-mother contends that the trial court's decision to make the paternal grandmother the children's guardian is not supported by its findings of fact or conclusions of law. In advancing this argument, respondent-mother begins by focusing upon Conclusion of Law No. 2, in which the trial court states that:

> [p]lacement of the children, [Brittany] and [Brianna], to [respondent-mother] or father's home at this time is contrary to their health, safety, welfare, and best interest. Conditions that led to the custody of the children by [HSA] and removal from the home of the parent(s) continue(s) to exist.

In respondent-mother's view, the trial court erred by making this determination because (1) the best-interests standard has no application in this instance given that

she did not act inconsistently with her constitutional right to parent Brittany and Brianna and (2) the challenged conclusion of law is not supported by the trial court's findings of fact. More specifically, respondent-mother argues that her compliance with the provisions of her family services agreement, HSA's recommendation that a trial home placement be authorized in September 2019, and the trial court's decision to allow unsupervised visitation between respondent-mother and the children deprived the trial court's determination that "placement in [her] home [would be] contrary to the girls' health, safety and welfare" and that "the conditions that led to the custody of the children and removal from the home of the parent continue to exist" of sufficient support in the trial court's findings.

¶ 51        In addition, respondent-mother challenges the validity of Conclusion of Law No. 3, in which the trial court states that

> [HSA] has made reasonable efforts to finalize the permanent plan to timely achieve permanence for the children and prevent placement in foster care, reunify this family, and implement a permanent plan for the children. Foster placement has been avoided by placement with the paternal grandmother.

Consistent with her earlier arguments, respondent-mother directs our attention to the fact that she completed the requirements of her family services agreement before arguing that, since "HSA abruptly moved the [trial] court to award guardianship to the paternal grandmother, the trial court erred when it concluded that HSA's efforts to finalize the permanent plan of reunification were reasonable."

Finally, respondent-mother challenges the validity of Conclusion of Law No. 4, in which the trial court states that

> after considering priority placement of the minor child[ren] with a relative who is willing and able to provide proper care and supervision in a "safe home," the best interest of the minor children, [Brittany] and [Brianna], would be served by awarding guardianship to [the paternal grandmother].

As was the case with respect to Conclusion of Law No. 2, respondent-mother argues that the "best interest of the child" standard has no application in this case given that she had not acted inconsistently with her constitutionally protected right to parent Brittany and Brianna.

In responding to these arguments, HSA points out that neither Judge Carpenter nor respondent-mother appear to dispute the validity of the trial court's determination that making the paternal grandmother the guardian for the children was in their best interests and that, instead, respondent-mother appears to simply challenge the analytical rubric that the trial court utilized in making that determination. HSA argues that the children "had been in [HSA] custody for nineteen months at the [time of the 30 January 2020] hearing;" that "[t]hey deserved permanence with the relative who had shouldered all parental responsibilities and provided care, custody, and support for them since their birth;" that respondent-mother had "ceded all custody, control, and responsibility for the girls to [the paternal

grandmother] when she left the girls in 2015;" and that, for all of these reasons, "it was in the [girls'] best interest to be in the guardianship of their grandmother."

¶ 54        Arguing in reliance upon *J.J.H.*, HSA contends that the fact that respondent-mother satisfied the requirements of her family services agreement does not, in and of itself, suffice to overcome the concerns that had initially prompted the children's placement in HSA custody, with those concerns having included respondent-mother's "lack of contact and involvement in the girls['] lives for three years prior to [HSA] involvement and inappropriate housing." In addition, HSA argues that "[t]he lack of appropriate housing for [respondent-mother] continued up and through the time just prior to the [30 January 2020] permanency planning hearing" and that the trial court's findings with respect to this issue, coupled with its findings that the children continued to experience problems after spending the weekend with respondent-mother, that the children had lived with the paternal grandmother for most of their lives, and that the children had expressed a desire to continue living with the paternal grandmother "provide[d] ample support for the trial court's conclusion that placement of the children in [respondent-mother's] home would be contrary to their health, safety, welfare[,] and best interest."

¶ 55        A careful review of the record satisfies us that HSA has the stronger hand in this dispute. To the extent that respondent-mother's arguments rest upon a contention that she had not acted inconsistently with her constitutionally protected

right to parent her children, we conclude, for the reasons set forth above, that this argument lacks merit, with it having been perfectly appropriate for the trial court to have applied the "best interest of the child" standard in resolving the guardianship issue. *See Owenby*, 357 N.C. at 146 (noting that, "[o]nce a court determines that a parent has actually engaged in conduct inconsistent with the protected status, the 'best interest of the child test' may be applied without offending the Due Process Clause."). In addition, we hold that the trial court's findings of fact suffice to support its determination that the "[c]onditions that led to the custody of the children by [HSA] and removal from the home of the parent(s) continue(s) to exist." Although, as the Court of Appeals correctly noted, "the immediate impetus for removal of the children from the home where they had resided since birth—Father's intoxication and violence in the home—did not continue to exist" once the father had been arrested and the children had been placed with the paternal grandmother, *B.R.W.*, ¶ 53, the initial decision to place the children in HSA custody also rested upon respondent-mother's absence from the home for the last three years and her failure to obtain adequate housing for the children. As a result of the fact that respondent-mother's abdication of responsibility for the children in 2015 clearly contributed to their placement in HSA custody and the fact that respondent-mother had failed to obtain suitable housing until shortly before the 30 January 2020 permanency planning hearing despite the fact that HSA's involvement began in early to mid-2018, we hold

that the trial court's findings of fact provide adequate support for its conclusion that the conditions that had led to the children's removal from the family home continued to exist.

¶ 56       Finally, as the Court of Appeals noted, respondent-mother has cited no authority, and we are aware of none, suggesting that a sudden change in the permanency planning recommendation made by a social service agency establishes that the agency had failed to make reasonable efforts toward reunifying the children with one or the other of their parents.  On the contrary, the trial court's findings clearly demonstrate that HSA worked diligently to reunify respondent-mother with her children for well over a year and only changed its recommendation after receiving information concerning the children's negative reactions to their weekend visits with respondent-mother and the stepfather and the children's living preferences that HSA deemed relevant to their best interests.  As a result, the trial court's findings of fact were more than adequate to support the challenged conclusions of law concerning the adequacy of HSA's reunification efforts.

## III.    Conclusion

¶ 57       Thus, for the reasons set forth above, we hold that the trial court's factual findings suffice to support its conclusion that respondent-mother had acted inconsistently with her constitutionally protected right to parent her children and that the trial court did not err in applying the "best interest of the child" standard in

awarding guardianship over the children to the paternal grandmother. As a result,

we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice EARLS dissenting.

¶ 58    Not every parent who leaves her child in someone else's care, even for an extended period of time, acts inconsistently with her constitutional status as a parent. Sometimes, a child needs something more or something different than what a parent can provide at a given moment. In these circumstances, a parent who cedes physical custody of a child to another trusted adult—for example, a child's grandparent—may be making the painful but necessary choice that protects that child from harm and puts that child in a better place. Recognizing these complexities, this Court has "emphasize[d] . . . that there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody, such as under a foster-parent agreement or during a period of service in the military, a period of poor health, or a search for employment." *Price v. Howard*, 346 N.C. 68, 83 (1997).

¶ 59    And not every family looks like two parents and a child. *Cf. Michael H. v. Gerald D.*, 491 U.S. 110, 141 (1989) ("We are not an assimilative, homogeneous society, but a facilitative, pluralistic one . . . . Even if we can agree, therefore, that 'family' and 'parenthood' are part of the good life, it is absurd to assume that we can agree on the content of those terms and destructive to pretend that we do.") (Brennan, J., dissenting). Grandparents, aunts and uncles, siblings, cousins, faith leaders, trusted friends—all have been called upon at various times in many communities to perform a vital function caring for children other than their own. *Moore v. City of*

*East Cleveland*, 431 U.S. 494, 508 (1977) ("The Constitution cannot be interpreted . . . to tolerate the imposition by government upon the rest of us of white suburbia's preference in patterns of family living. The 'extended family' that provided generations of early Americans with social services and economic and emotional support in times of hardship . . . remains not merely still a pervasive living pattern, but under the goad of brutal economic necessity, a prominent pattern virtually a means of survival for large numbers of the poor and deprived minorities of our society.") (Brennan, J., concurring). In these circumstances, the involvement of other adults in childrearing does not make that child's parent any less of a parent. Consistent with the reality that family life takes many different forms, a parent's conduct in a situation involving nonparental caregivers "need[s] to be viewed on a case-by-case basis" to determine if it justifies overriding "the constitutional protection of parental interests in such a situation." *Price*, 346 N.C. at 83.

¶ 60        In its decision today, this Court chooses to look away from the complexities and realities of family life in this state. Its choice is not compelled by our precedents, which recognize that a trial court must conduct a case-specific inquiry and enter factual findings addressing the circumstances surrounding a parent's departure before determining that a parent who has left her children in someone else's care has acted inconsistently with her constitutional status as a parent. Our precedents are clear that absent sufficient findings, the proper course is to vacate and remand for

further proceedings. *See Price*, 346 N.C. at 84. Nevertheless, the majority chooses to affirm an order that is devoid of findings addressing questions that needed to be answered before dislodging respondent-mother's parental rights. The majority proceeds to compound the error by concluding that the trial court order contains adequate findings of fact to support its conclusion that the conditions leading the Yadkin County Human Services Agency (HSA) to take custody of respondent-mother's children "continue[ ] to exist," notwithstanding respondent-mother's uncontroverted success in completing the terms of her family services agreement and securing a safe and stable home for her children.

¶ 61        This Court's decision puts parents who are trying to navigate challenging circumstances, including those who are experiencing domestic violence, in an impossible bind: while a parent who chooses to remain in an unsafe living environment with her children risks having her children adjudicated neglected or her parental rights terminated, a parent who escapes a dangerous living environment but needs time to get back on her feet risks having her parental rights displaced precisely because of her efforts to seek out a safe and stable home. *Compare In re T.B.,* 2022-NCSC-43, ¶ 26 (affirming order terminating parental rights on ground of neglect in part because "[r]espondent-mother did not immediately end the relationship and separate from respondent-father" after respondent-father committed acts of domestic violence) *with In re I.K.*, 377 N.C. 417, 2021-NCSC-60,

¶ 35 (affirming order determining that respondent acted inconsistently with his constitutionally protected status as a parent after he "voluntarily placed [his child] with [the child's] maternal grandmother 'until [his] housing situation was resolved' "). This Court's decision also potentially signals to parents that even if they comply with every element of a case plan or family services agreement developed during a juvenile proceeding, their parental rights are always subject to displacement should a court decide that another caregiver offers a "better" home for their child. That is contrary to what our statutes provide and what the constitution requires. Therefore, I respectfully dissent.

## I.    The trial court's determination that respondent-mother acted inconsistently with her constitutional parental status

¶ 62        On an appeal from a permanency planning order, our review is limited to "determin[ing] whether the [trial court's] findings are supported by clear, cogent, and convincing evidence and . . . whether [the] trial court's *findings of fact* support its conclusions of law." *In re S.R.F.*, 376 N.C. 647, 2021-NCSC-5, ¶ 9 (quoting *In re J.S.*, 374 N.C. 811, 814–15 (2020) (emphasis added)). As an appellate court, we are charged with applying the law in light of the undisturbed *findings* the trial court enters. *Coble v. Coble*, 300 N.C. 708, 713 (1980) ("[A] conclusion of law . . . must itself be based upon supporting *factual findings*.") (emphasis added). Our task is not to root around in the record to fill in gaps based on what we think the trial court could or should have found but did not. *Id.* at 713–14 ("It is true that there is evidence in the record from which

findings could be made which would in turn support the [trial court's legal] conclusion . . . . What all this evidence does show, however, is a matter for the trial court to determine in appropriate factual findings."). This limitation on the scope of appellate review reflects both our lack of institutional competence to find facts and our recognition that a trial court may choose *not* to find a particular fact even when there is evidence in the record that could support a particular finding. *Id.* at 712–13 ("It is not enough that there may be evidence in the record sufficient to support findings which could have been made. The trial court must itself determine what pertinent facts are actually established by the evidence before it, and it is not for an appellate court to determine de novo the weight and credibility to be given to evidence disclosed by the record on appeal.").

¶ 63        It is undoubtedly correct that, as the majority recites, "a period of voluntary nonparent custody[ ] *may* constitute conduct inconsistent with the protected status of natural parents and therefore result in the application of the 'best interest of the child' test." *Price*, 346 N.C. at 79. But a period of voluntary nonparent custody also may *not* constitute conduct inconsistent with a parent's constitutional status. As this Court recognized in *Price*, "there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody, such as under a foster-parent agreement or during a period of service in the military, a period of poor health, or a search for employment."

*Id.* at 83. To decide what legal significance to assign to a parent's actions, courts look to a variety of factors indicative of the parent's conduct and intentions at the time custody is ceded to a third-party, including "whether [the parent's] voluntary relinquishment of custody to [a caregiver] was intended to be temporary or indefinite and whether [the parent] informed [the caregiver] and the child that the relinquishment of custody was temporary." *Id.* "[W]hen a parent brings a nonparent into the family unit, represents that the nonparent is a parent, and voluntarily gives custody of the child to the nonparent without creating an expectation that the relationship would be terminated, the parent has acted inconsistently with her paramount parental status." *Boseman v. Jarrell,* 364 N.C. 537, 550–51 (2010).

¶ 64        Accordingly, an order determining that a parent has acted inconsistently with his or her parental status should contain findings addressing the factors that must be considered in order to distinguish between conduct that does, and conduct that does not, comprise a forfeiture of that parent's parental rights. When the order does not contain those findings and the record is inconclusive, remand is necessary. Thus, in *Price*, we vacated a custody order and remanded to the trial court for further proceedings "because the trial court made no findings about whether [the parent] and [the caregiver] agreed that the surrender of custody [to the caregiver] would be temporary, or about the degree of custodial, personal, and financial contact [the parent] maintained with the child after the parties separated." *Id.* at 84. Even though

it was "clear from the record" that the parent "created the existing family unit that includes [the caregiver] and the child, but not herself," "represented to the child and to others that [the caregiver] was the child's natural father," and "chose to rear the child in a family unit with plaintiff being the child's de facto father," we held that a remand was necessary because the record evidence "shows that the parties disputed whether defendant's voluntary relinquishment of custody to plaintiff was intended to be temporary or indefinite[.]" *Id.* at 83. Because the *trial court* did not enter any findings addressing this question, we explained that "we cannot conclude whether [the parent] should prevail based upon the constitutionally protected status of a natural parent or whether the 'best interest of the child' test should be applied." *Id.* at 84; *see also Powers v. Wagner*, 213 N.C. App. 353, 363 (2011) ("While the record contains evidence related to the scenarios identified in *Price*, it was the responsibility of the trial court to make the necessary factual findings. Without the necessary findings, there can be no determination that [the mother] acted inconsistently with her constitutional right to parent.").

¶ 65      I certainly agree with the majority that "the general principles enunciated" in *Price* and subsequent cases are applicable in this case. That is why it is so puzzling that the majority chooses to affirm the trial court's order in this case in the absence of any finding addressing whether respondent-mother intended, and the paternal grandmother understood, the paternal grandmother's caregiving arrangement to be

temporary or permanent. The only findings the trial court entered that address the circumstances of respondent-mother's leaving the children with the paternal grandmother are as follows:

> 13. [Brittany] and [Brianna] have been placed with their paternal grandmother . . . since June 14, 2018 (now 19 months). Both children have actually resided in [the paternal grandmother's] home since birth – prior to June 14, 2018 either both or one of their parents also resided in the home. The mother and father resided in the home together with the children until September 2015 when the mother left (the parents separated).
>
> 14. After September 2015 the mother would visit the children on holidays [and] birthdays but did not take the children overnight.
>
> . . . .
>
> 28. When the mother left the [family] home in September 2015 she was scared. She did not take the children with her because of being frightened and because she did not have a stable home to provide the children. The mother married [her current husband] is [sic] 2016. She has not had a stable home that was large enough for the girls until recently.
>
> . . . .
>
> 34. The [c]ourt finds the [respondent-mother] . . . by clear and convincing evidence . . . ha[s] acted in a manner inconsistent with [her] constitutionally protected status as a parent.

These findings tell us why and when respondent-mother left the home; they say nothing "about whether [the parent] and [the caregiver] agreed that the surrender of custody [to the caregiver] would be temporary." *Price*, 346 N.C. at 83. Furthermore,

respondent-mother's intentions upon leaving the home were disputed; respondent-mother testified that she did not take her children with her "[b]ecause [she] didn't have a stable place" to live, so she left them with their paternal grandmother "until I could find me something stable." The same unresolved factual issue that compelled us to remand in *Price* went unresolved by the trial court in this case.

¶ 66      The trial court's order also tells us nothing about whether respondent-mother "represent[ed] that" the paternal grandmother was "a parent" to Brittany and Brianna, whether the paternal grandmother understood herself to be the children's parent, and what the children understood the situation to be. *Boseman*, 364 N.C. at 550–51. Confronted with an order containing insufficient findings, this Court should follow its own precedent and remand, just as we did in *Price*.

¶ 67      The majority attempts to obscure the absence of necessary factual findings from the trial court's order by ascribing outsized meaning to the findings the trial court actually made. For example, the majority states that the

> minimal degree of contact that respondent-mother had with the children prior to their placement in HSA custody further indicates that respondent-mother intended for the paternal grandmother to continue to provide primary care for the children for "an indefinite period of time with no notice that such relinquishment of custody would be temporary," particularly given respondent-mother's failure to take any steps to regain custody of Brittany and Brianna until after they entered HSA custody[.]

That is quite a leap from the trial court's finding that "the mother would visit the

children on holidays [and] birthdays but did not take the children overnight." It is unclear precisely how or why respondent-mother's maintenance of consistent (although somewhat infrequent) contact with her children while they were in the paternal grandmother's care demonstrates she intended the paternal grandmother to be the children's caregiver indefinitely. If it is because respondent-mother "did not take the children overnight," well, consider the alternative: if respondent-mother had hosted her children for overnight visits despite not having a "stable" place to live, it is easy to imagine a court finding that she had jeopardized their welfare by doing so. *Cf. In re M.A.*, 378 N.C. 462, 2021-NCSC-99, ¶ 30 (affirming a termination order on the basis of neglect in part because "[a]t the time of the termination hearing, respondent was . . . sharing a studio apartment with an unknown roommate, was not listed on the lease as a tenant, and was not paying utilities for the apartment").

In the alternative, the majority implies that the requirements of *Price* have been met because "the trial court's findings clearly show that [the children's paternal grandmother] stood *in loco parentis* to Brittany and Brianna." Putting aside the majority's lack of an explanation as to which findings "clearly show" this to be true, it cannot be the case that determining whether the paternal grandmother stood *in loco parentis* to Brittany and Brianna is "the relevant inquiry for purposes of our analysis" under *Price*. As the Court of Appeals has correctly explained,

> [t]he fact that a third party provides caretaking and
> financial support, engages in parent-like duties and

> responsibilities, and has a substantial bond with the children does not necessarily meet the requirements of *Price* . . . . Those factors could exist just as equally for . . . a step-parent or simply a significant friend of the family, who might not meet the *Price* standard.

*Estroff v. Chatterjee*, 190 N.C. App. 61, 74 (2008). Presumably, the majority does not mean to imply that every parent who has allowed another adult to stand *in loco parentis* to his or her child has acted inconsistently with his or her status as a parent. *See Drum v. Miller*, 135 N.C. 204, 216 (1904) (stating that a teacher stands *in loco parentis* to students when they are present at school); *Craig v. Buncombe Cty. Bd. of Educ.*, 80 N.C. App. 683, 686 (1986) (explaining that "the need to control the school environment and the school board's position *in loco parentis*" allows school authorities to regulate students' conduct while at school).

¶ 69 The majority also relies on *In re Gibbons*, 247 N.C. 273 (1957), a case that, as the majority acknowledges, "was decided well before the enactment of the current North Carolina Juvenile Code and our decisions in cases like *Adams* and *Troxel*[.]" According to the majority, "[t]he facts at issue in this case bear a strong resemblance to those that were before us in *Gibbons*, in which the child's adoptive father placed the child in the home of a nonparent married couple after the death of the father's wife at a time when the child was just two years old." Notably, the majority overlooks a crucial factual distinction between *Gibbons* and this case: in the former, the trial court entered a "finding[ ] of fact" that shortly after taking custody of the child, the

nonparent married couple "requested [the father] to take [the child], but [the father] declined to do so and *indicated at the time that he desired that the boy should remain permanently* with the [nonparent married couple]." *Gibbons*, 247 N.C. at 279 (emphasis added). *Gibbons* confirms rather than detracts from *Price*'s conclusion that a remand is appropriate in the absence of findings addressing what a parent intended when ceding custody to a nonparental caregiver and what the nonparental caregiver agreed to when taking custody of the parent's child.

*Gibbons* is also unlike this case in another important way. In *Gibbons*, it appears that the father asserted his interest in parenting his son by going "into the Sunday School Room of the New Hope Baptist Church, and carr[ying] this boy away with him, in spite of his screaming, protests and efforts to escape." *Id.* at 279–80. That bears no resemblance to how respondent-mother asserted her interest in parenting Brittany and Brianna. Here, respondent-mother indicated her desire to reassume custody of her children when HSA got involved in their lives. Over the next two years, she did everything HSA asked of her—as the trial court found, she "completed [her] family service agreement" and secured a stable home for her children. The very purpose of a family services agreement or case plan is to inform a parent of what he or she needs to do in order to "address[ ] the barriers to reunification between [a] respondent-[parent] and [the parent's child]." *In re S.D.*, 374 N.C. 67, 73 (2020). If "evidence of a parent's conduct should be viewed cumulatively," *Owenby v.*

*Young*, 357 N.C. 142, 147 (2003), then respondent-mother's undisputed progress in eliminating the barriers HSA identified to reunification with Brittany and Brianna must count for something. Yet in the majority's analysis, respondent-mother's demonstrable progress towards reunification is essentially meaningless.

¶ 71        The majority's rejoinder to this argument is that just as "a parent's compliance with his or her case plan does not preclude a finding of neglect,"

> the fact that respondent-mother complied with the provisions of her family services agreement does not overcome the effect of her prior decision to surrender custody of her children to the paternal grandmother, particularly given the trial court's findings that the children's paramount bond was with the paternal grandmother rather than with respondent-mother and the difficulties that the children have experienced in being away from their grandmother.

I agree that a parent's compliance with a case plan does not, on its own, necessarily negate the claim that a parent has acted inconsistently with her parental status. Still, if a parent's completion of the terms of a family services agreement is a complete non-factor when it comes time to decide whether or not the parent can exercise her parental rights, it calls into question the value of these family services agreements as tools to help parents address the conditions leading to the removal of a child and to ultimately achieve reunification. HSA told respondent-mother she needed to do various things to reunite with her children; respondent-mother did everything HSA asked of her; today, this Court tells respondent-mother that she cannot reunify with

her children because of something she did before she ever entered into the agreement with HSA. It is difficult to imagine what else respondent-mother could have done to reestablish herself as a parent to her children.

¶ 72        Separately, it is notable that even when the majority is purporting to assess whether respondent-mother acted inconsistently with her constitutional parental status—a question that is necessarily analytically prior to the question of whether placing the children with respondent-mother is in the children's best interests—the majority slips into reasoning based upon its view of the children's best interests by comparing the relative strength of the children's bond with their mother and their paternal grandmother. Although all courts administering North Carolina's Juvenile Code share an interest in achieving the best possible outcome for all children, a parent's constitutional rights cannot be disturbed based solely upon a court's subjective beliefs regarding the comparative benefits of two different placement options. *Owenby v. Young*, 357 N.C. 142, 146 (2003) (explaining that it is only "[o]nce a court determines that a parent has actually engaged in conduct inconsistent with the protected status[ that] the 'best interest of the child test' may be applied without offending the Due Process Clause"). In concluding that respondent-mother has acted inconsistently with her parental status in part because the children have a stronger bond with their paternal grandmother—even though the undisputed findings establish that the children also feel bonded to respondent-mother—the majority

collapses the threshold inquiry concerning whether a parent's constitutional parental rights can be displaced into the subsequent judgment regarding whether a parent's parental rights should be displaced.

In light of the profound importance of a trial court's threshold determination that a parent has acted inconsistently with her parental status, this Court should at least adhere to our precedents requiring trial courts to enter adequate findings of fact to support this determination. When presented with a trial court order lacking adequate findings, our precedents dictate that we remand for further factfinding rather than assuming an answer in the absence of necessary information.

"The purpose of the requirement that the court make findings of those specific facts which support its ultimate disposition of the case . . . is [ ] not a mere formality or a rule of empty ritual." *Coble*, 300 N.C. at 712. Rather, the purpose of the requirement "is to allow a reviewing court to determine from the record whether the judgment and the legal conclusions which underlie it represent a correct application of the law" and to "to allow the appellate courts to perform their proper function in the judicial system." *Id.* (cleaned up). Requiring the factfinder to find facts during an adversarial proceeding is at the heart of ensuring a rigorous and disciplined search for the truth, based on evidence presented in court and subject to cross-examination. *State v. Bartlett*, 368 N.C. 309, 313 (2015) ("The trial judge who presides at a [ ] hearing sees the witnesses, observes their demeanor as they testify and by reason of

his [or her] more favorable position, he [or she] is given the responsibility of discovering the truth.") (cleaned up). It is a core feature of our system of justice and the only way meaningful review by an appellate court can ensure that all parties are treated fairly and equally under the law. In this context, vacating an order that does not contain findings of fact addressing "both the legal parent's conduct and his or her intentions" is necessary to accurately determine the legal significance of respondent-mother's actions and "to ensure that the situation is not one in which the third party has assumed a parent-like status on his or her own without that being the goal of the legal parent." *Estroff*, 190 N.C. App. at 70. Accordingly, consistent with our precedents, we should vacate the trial court's order and remand for further proceedings.

## II. The trial court's determination that awarding guardianship to the children's paternal grandmother is in the children's best interests

Because the trial court's findings do not support its conclusion that respondent-mother acted inconsistently with her parental status, I would not reach the question of whether to affirm the trial court's determination that awarding guardianship to Brittany's and Brianna's paternal grandmother was in the children's best interests. Still, I write to note my disagreement with one aspect of the majority's reasoning on this issue.

The majority holds that the trial court's conclusion that "[c]onditions that led to the custody of the children by [HSA] and removal from the home of the parent(s)

continue(s) to exist" is supported by the trial court's findings of fact. Specifically, the majority reasons that

> [a]s a result of the fact that respondent-mother's abdication of responsibility for the children in 2015 clearly contributed to their placement in HSA custody and the fact that respondent-mother had failed to obtain suitable housing until shortly before the 30 January 2020 permanency planning hearing despite the fact that HSA's involvement began in early to mid-2018, we hold that the trial court's findings of fact provide adequate support for its conclusion that the conditions that had led to the children's removal from the family home continued to exist.

But another way of saying that "respondent-mother had failed to obtain suitable housing until shortly before the 30 January 2020 permanency planning hearing" would be to say that "respondent-mother obtained suitable housing before the 30 January 2020 permanency planning hearing." If the trial court had entered findings indicating that respondent-mother was dilatory in seeking out housing options or otherwise refused to take necessary steps to secure and maintain a suitable home, then the fact that she had only recently secured suitable housing might have been relevant. Absent such findings, there is no way for this Court to know if the reason respondent-mother did not more rapidly obtain suitable housing was because of her own actions or because of factors out of her control, such as the difficulty many families face when attempting to locate and secure affordable housing. If respondent-mother could not obtain suitable housing because of her lack of resources, her inability to obtain suitable housing would not be a permissible basis for displacing

her constitutional parental rights. *Cf. In re M.A.*, 374 N.C. 865, 881 (2020) ("[Parental rights are not subject to termination in the event that [a parent's] inability to care for her children rested solely upon poverty-related considerations."). Regardless, it is wrong to state that respondent-mother's lack of suitable housing was a condition that "continue[d] to exist" at the time of the termination hearing when the trial court's own findings confirm she had obtained suitable housing prior to the termination hearing.

### III.    Conclusion

¶ 77        Respondent-mother left her children and her family home after the children's father, who had just been released from prison, returned and resumed using drugs and alcohol. She was "scared" of the children's father and "did not take [her two] children with her because of being frightened and because she did not have a stable home to provide the children." Instead, she left the children in the care of their paternal grandmother, who had lived with respondent-mother and the children in their home and with whom respondent-mother maintained a constructive relationship. Over the next three years, respondent-mother visited the children for birthdays and holidays but did not host them for overnight visits. After the children's father was arrested again, local authorities got involved to ensure the children's well-being. At this point, respondent-mother indicated that she wanted to take the children back into her care, agreed to a case plan specifying what she needed to do to

achieve reunification, and subsequently complied with every term of that agreement and secured the safe and stable home she previously lacked.

¶ 78 That is, essentially, the sum total of what the trial court's findings of fact tell us with respect to the question of whether respondent-mother acted inconsistently with her constitutional status as a parent. On the basis of these findings, the majority concludes that respondent-mother's parental rights can be displaced and affirms an order awarding guardianship to the children's paternal grandmother over the respondent-mother's wishes. These circumstances certainly could encompass a situation where respondent-mother by her conduct forfeited her parental rights. But they could also encompass a situation where respondent-mother responsibly safeguarded her children's interests by making a difficult decision under trying circumstances. Absent sufficient findings, it is improper for this Court to presume it was the former situation and not the latter.

¶ 79 The majority's decision potentially sends an unfortunate message to parents who have experienced difficulties raising their children but who are nonetheless working diligently towards reunification. Although this Court's decision today displaces her legal status as Brittany and Brianna's parent, respondent-mother's efforts to reunify with her children cannot be diminished. As respondent-mother testified at the permanency planning hearing:

> I mean, I just want to make it clear – I mean it seems like
> I been – I feel like you put me out here to – like I've never

been there. I mean, I – I'm the one that had them. Yes, I've been there. I'm the one that stayed in the hospital with [Brittany] after I had a C section and caught two infections. I was out for over two weeks. Had to have a blood transfusion. Nobody else there was with me. He left me there. Nobody was with me. I've been there. They're my girls and I love them.

Accordingly, I respectfully dissent.